SUNCREST LUMBER COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 33244. Promulgated January 26, 1932.

376

*E. S. Parker, Jr., Esq.*, and *J. L. Elliott, C. P. A.*, for the petitioner.

*Bruce A. Low, Esq.*, and *L. H. Rushbrook, Esq.*, for the respondent.

378

382

OPINION.

Seawell: The first issues presented in this proceeding relate to the depreciation and depletion allowable as a deduction from gross

income in each of the years here involved, the contention of the petitioner being that the deductions allowed on that account in the deficiency notice are inadequate, and that of the Commissioner being that such allowances are excessive. A consideration of the contention advanced by the Commissioner will show the several questions which are here to be disposed of.

As shown from our findings, the petitioner acquired certain properties from the Champion Lumber Company through foreclosure proceedings which were instituted by the bondholders of the Champion Lumber Company. The bid price by the petitioner at such sale held on September 23, 1918, was $1,000,000 and it is the Commissioner's contention that this bid price represents cost of the properties to the petitioner and would accordingly provide the starting point or base for the computation of depreciation and depletion allowances for subsequent years. Some of the argument advanced was to show that the transaction through which the properties were acquired constituted a purchase and not a reorganization, and with this position we are in accord. Whether the bondholders in the Champion Lumber Company were also its stockholders and in the same proportion does not definitely appear, though it does appear that only the bondholders as such as distinguished from the stockholders participated in the acquisition of the properties. That is, the bondholders took the various steps incident to their protection, which included the organization of the petitioner for the purpose of having the properties acquired by it, and the stockholders as such were entirely eliminated. There thus came into ownership of the properties not only a new corporation, but also new interests in such corporation which were essentially different from those in the old corporation. Under such circumstances, we have no hesitancy in saying that cost of such properties to the petitioner when acquired through the foreclosure sale in 1918 rather than cost to the Champion Lumber Company must be our starting point in the determination of a depreciation and depletion allowance as well as for invested capital purposes. Cf. *Marr* v. *United States*, 268 U. S. 536.

A question presenting more difficulties, however, is to determine what was cost to the petitioner to be used as the basis for its future depreciation and depletion. In the first place, is such cost fixed, as the Commissioner contends, by the bid price at the foreclosure sale of $1,000,000? We think not. In short, what occurred was that the Champion Lumber Company became financially involved, and on the petition of certain of its creditors (other than its bondholders) it was declared a bankrupt on September 11, 1916. At or about that time the bondholders became active in an effort to protect their interests as represented by bonds then outstanding of a face value of some $2,755,000. A bondholders' protective com-

mittee was first organized, which was later succeeded by a board of reorganization managers, and through these organizations the petitioner was formed for the purpose of taking over the property of the Champion Lumber Company, should it be acquired at a foreclosure sale. In the meantime, there was a default on the bonds and the foreclosure proceedings were instituted. In due course the property was ordered sold and the petitioner, in conjunction with the board of reorganization managers, was authorized to bid $250,000, or, in its discretion, $1,000,000, for the property. Further, the charter of the petitioner contemplated the acquisition by it of the bonds of the Champion Lumber Company. In order to raise the cash deposit of $125,000 required to qualify the petitioner as a bidder at the sale, the board of reorganization managers gave a collateral note secured by bonds of the Champion Lumber Company. At the sale the highest bid and the only bid (in so far as appears from the record) was that of $1,000,000 by the petitioner. No part of the bid price in excess of the cash deposit was paid in cash, and even the part of the cash deposit which was not required to pay court and foreclosure costs and satisfy the small minority which did not join in the acquisition of the property was turned over to the petitioner. The remainder of the purchase price was satisfied by the petitioner through the issuance of its bonds for bonds of the same face value held by the bondholders of the Champion Lumber Company and the delivery of these old bonds to the court. In other words, the bid price of $1,000,000 was not satisfied through the payment of that amount, but in another manner as indicated above. We must look to what was done rather than to what might have been done in order to find the correct solution to the problem, and when that is done, the answer is evident that $1,000,000 may not be considered as the conclusive measure of cost.

In reaching the conclusion that the bid price of $1,000,000 may not be considered as the measure of the cost to petitioner, we are not overlooking the fact that within ten days after the sale a bid of $1,100,000 was submitted, but aside from the fact that such bid was rejected by the court and that we are not advised as to any relationship which may have existed between the bidder (Champion Fibre Company) and the Champion Lumber Company, the bid was not one which, if considered better than that of the petitioner, would have meant that such bidder thereby became the purchaser, but rather that the property would again be offered for sale. Under such conditions the bondholders would still have been able to take further steps for the protection of their interests by bidding, if they desired, at the subsequent sale. Besides, as indicated by the court in rejecting the higher bid, such bid gave to the bondholders no

additional margin of security beyond the $125,000 deposit, and therefore its acceptance would have tended to defeat the primary object of the foreclosure proceedings. Nor have we disregarded the fact that all bondholders did not join in the purchase through foreclosure proceedings, but a small number elected to take their pro rata payments in cash. However, when we consider the small minority, which apparently was made up of a considerable number of small bondholders in various parts of the country, we do not think this material.

We are also of the opinion that this case is easily distinguishable from that of *Petree* v. *United States*, 34 Fed. (2d) 563; affd., 41 Fed. (2d) 517; certiorari denied, 282 U. S. 877 on which much reliance is placed by the Commissioner in substantiation of his contention that the bid of $1,000,000 is conclusive as to cost to petitioner. That case involved a situation where in 1915, after a corporation was adjudged a bankrupt, its property was sold at public auction and bid in by a new corporation which had been formed. The money which was used by the new corporation in paying the purchase price was advanced by three stockholders of the old corporation, who had held 63 per cent of the stock of such old corporation. In consideration for such advancement, the three old stockholders had issued to them the entire capital stock of the new corporation. In 1917 these same stockholders sold their stock, and the question presented was the basis to be used in determining the gain to them on account of the sale in 1917, the contention of the stockholders being that the gain would be represented by the difference between the March 1, 1913, value of the stock in the old corporation and the selling price of the stock of the new corporation in 1917, whereas, the Government contended that the cost of the stock sold in 1917 was the amount paid by the new corporation for the assets at the receiver's sale in 1915. The court rejected the contention of the stockholders, held that there was no reorganization through the receiver's sale and acquisition of the stock by the new corporation, and entered judgment for the Government, concluding its opinion with the following summary of its view of the situation:

That the company was adjudged a bankrupt in 1915 and *all stockholders* lost their investment and the stock was rendered valueless; that the new corporation directly became the purchaser of all the assets of the old corporation, including the leasehold; that plaintiffs financed the transaction with their private funds; that the new corporation issued its entire capital stock to the plaintiffs for the amount advanced by them in financing the transaction; that this amount was the cost of the stock to them; that subsequently the stock sold at an undisputed figure upon which they have paid an income tax.

It is a hard case because plaintiffs lost a large amount of money in the Black Diamond Coal Company and were unable under the law to deduct that

loss from the profit made by them in the sale of the stock in the new corporation in 1917, just two years later. If the entire transaction cannot, under the authorities, be held a reorganization, there is no relief to be had.

The court further said that the old stock was worthless in 1915 and that a complete loss resulted to the old stockholders at that time. On appeal the judgment was affirmed in part, on the ground that the question was improperly presented for review, but in rendering its opinion the court said:

* * * A judgment for defendant upon facts found can be erroneous only when judgment for plaintiff is imperative. Identity and continuity of investment, before and after, are not here found as ultimate facts; the form of the transaction contradicts such continuity; and in view of the presumption that the Commissioner's computations of cost and value are correct, we cannot say that there was such a clear mistake as compels a court to overrule him.

We are not here concerned with a receiver's sale where the entire investment of the party (or those whom it represented) who bid in the property had become valueless, but rather a sale under foreclosure proceedings where the party (or those whom it represented) had not lost its entire investment and where the sale was being conducted for its benefit and the remaining value of its interest in the property was in a very substantial amount. In fact, in the *Petree* case the entire bid price was satisfied through new money advanced for that purpose by the party (or its representatives) who had lost its original investment, whereas, in the instant case the acquisition of the property was accomplished without the advancement of additional money other than for court and foreclosure costs and a small amount paid to minority bondholders. On the whole, we are convinced that the *Petree* case can not be considered controlling in the case at bar.

When we look to what here occurred we find that the petitioner first acquired substantially all of the bonds of the Champion Lumber Company ($2,664,500 of bonds outstanding in the amount of $2,755,000) through the issuance of its bonds therefor. After the petitioner had secured the aforementioned old bonds, these old bonds (together with the small amount of cash paid to minority bondholders) were used in satisfaction of the bid price and the property of the Champion Lumber Company was conveyed to petitioner. In other words, there was an exchange of property for property, namely, bonds of the Champion Lumber Company for the assets of the Champion Lumber Company, and gain or loss to petitioner on such transaction would be computed as the difference between the cost of the old bonds (plus the small amount of cash paid) and the fair market value of the property received in exchange (section 202 of the Revenue Act of 1918), and the starting point or cost to petitioner

on account of the property so acquired was its fair market value at the time of its receipt.

Both the petitioner and the Commissioner introduced evidence for the purpose of showing the value of the properties in question. The greater part of the evidence on the part of the petitioner was on account of a valuation of the depletable properties and to that end its general manager, who had been with petitioner since 1919, testified in detail as to such valuation, using as a basis a cruise made by him of the properties in 1919 or 1920. Based upon the number of feet which he considered then available and a market value per thousand feet, he gave as his opinion that the depletable properties had a value at the date of acquisition of $4,272,017. He was further of the opinion that the depreciable properties had a value at the same time of some $700,000, thus making a total valuation for both classes of property of approximately $5,000,000. We have further the testimony of two witnesses for the Commissioner, one of whom testified to a fair market value of the timber properties in 1918 of $1,372,000, and the other, of $1,600,000. The book value as shown in petitioner's capital stock return for the year ended December 31, 1919, was approximately $3,900,000, but it was stated in such return that " These values were inflated beyond all reason [in setting them up on the books of the petitioner] and in making the tax return were cut down to a fair value." The fair value as stated in such return was approximately $1,800,000. While we do not know the exact cost used in determining the depletion allowance as shown in the deficiency notice, it is stated in the Commissioner's brief that the cost allocated to depletable properties was $1,900,000, and from other evidence in the case as to timber cut, amount of depletion allowed and the agreement of the parties as to the rate used by the Commissioner, we are convinced that the allowance has been made approximately on the foregoing basis. The cost of depreciable property as used in the deficiency notice for 1921 in determining the depreciation allowance was approximately $750,000, thus making total costs for depletable and depreciable properties of approximately $2,650,000. We have carefully considered all evidence introduced, including not only the expert testimony and documentary evidence referred to above, but also the facts relating to the sale and the expenditures made in connection therewith, and we have reached the conclusion that the costs as used by the Commissioner are fair and reasonable and they are accordingly sustained.

We do not understand that there is any material disagreement between the parties as to the quantities of timber to be used in computing the depletion allowance, the issue being as to the cost of such

property, which has been determined as shown above, and since the depletion allowance as fixed by the Commissioner appears reasonable on the basis of the costs herein determined, the amounts as allowed by the Commissioner are approved. A further question is raised as to depreciation allowance, wherein the petitioner contends that the Commissioner based his allowance on a useful life of the sawmill plant and equipment of 10 years, instead of upon the time required to take the timber from the Sunburst tract. However, the rate claimed by the petitioner takes no account of a residual or further useful value for the property at the termination of the Sunburst operation, which was shown at approximately $200,000. The petitioner's position is that such further useful value should be disregarded in this case, because it was not known until 1925 that a location could be secured at Waynesville, to which this plant could be moved for operation on the Cataloochee tract. The last named tract was owned from the beginning of the operation at Sunburst and it seems only reasonable to think that consideration would be given to some use of such of the Sunburst equipment as could ordinarily be used in the manufacture of lumber on the Cataloochee tract, which was of about the same size. At any rate, when we consider the evidence offered as to the value of the depreciable assets (the highest value being approximately $700,000 and one value being as low as $300,000) and the fact that the Commissioner allowed depreciation on the basis of a cost of approximately $750,000 at the rate of 10 per cent, without regard to any residual value, we are of the opinion that the allowance as made is ample to care for all depreciation sustained and it is accordingly affirmed.

The foregoing discussion also disposes of the issue with respect to invested capital, since under the determination as made by the Commissioner invested capital would become a factor only in the event that income is increased materially through the disallowance of depreciation and depletion by the use of $1,000,000 (or approximately that amount) as a cost basis for such allowance and also the use of the same amount as the starting point for invested capital purposes, but since we have rejected the bid price at the foreclosure sale of $1,000.000 as fixing cost to petitioner, we are satisfied that no finding is necessary with respect to invested capital.

The next issue arises on account of the purchase by the petitioner of its own bonds at less than their face value and the retirement of the same. The difference between the price at which purchased and retired and their face value was reported by petitioner as taxable income, but it is now contended that such amount should not have been so reported and should have been excluded by the Commissioner in his determination. Since the hearing was had in this proceeding,

the Supreme Court decided the case of *United States* v. *Kirby Lumber Co.*, 284 U. S. 1, in which it was held that where a corporation purchases and retires its own bonds at a price less than the issuing price (which was face value), the excess of such issuing price over the purchase price constitutes taxable income. See also *Consolidated Gas Company of Pittsburgh*, 24 B. T. A. 901. The bonds here in question were issued at their face value for the bonds of the Champion Lumber Company, and no contention is made nor was evidence produced by the petitioner to the effect that the petitioner did not receive the full face value for its bonds when issued. In fact, the evidence produced by the petitioner was for the purpose of showing that the assets securing the bonds of the Champion Lumber Company had a value much greater than such bonds, and we have found a value for those assets approximately equal to the par value of the bonds. In view of the foregoing, we are of the opinion that the action of the Commissioner in approving the inclusion by the petitioner in taxable income of the difference between the face value of its bonds and the smaller amount at which they were purchased and retired should be sustained.

The final issue presented is the contention of the petitioner that, if it is determined that it otherwise realized taxable income for the years here under consideration, such income should be reduced by allowing a deduction on account of accrued interest on Class B–II bonds. We can see no merit to this position. The pertinent features of the trust indenture with respect to the payment of interest on these bonds are set forth in our findings and show clearly, in our opinion, that these bonds are income bonds upon which no interest liability attaches until the board of directors meet and "by resolution specifically set apart from net income as hereinbefore described such sums as may be spared therefrom to pay interest upon bonds of Series B Class II, or if none can be spared the Board shall specifically find that the net earnings do not justify the appropriation of any moneys to such interest payment" and "any [interest] coupon which shall not be paid in its order shall thereupon become null and void and shall not constitute an obligation of the company." The indenture further provided that "The discretion to determine what are net earnings and to fix the amount thereof is unreviewable and is hereby lodged in the Board of Directors of the Company." Not only was interest neither accrued on its books nor paid on any of the bonds during the years under consideration, but, also, at each semiannual interest date the board of directors determined that no earnings were available for such purposes and declared that the interest coupons due on such dates should be considered null and void. In view of the foregoing, we fail to see how at this time it could be said

that liability for interest attaches on account of coupons heretofore declared null and void by the parties who acted with unreviewable discretion in regard thereto, even though it should now be determined by the Commissioner and this Board that the petitioner is taxable on income in excess of that previously determined by the petitioner's board of directors.

Reviewed by the Board.

> *Judgment will be entered for the respondent in the amounts shown in the deficiency notice.*

Smith concurs in the result.